# STATE OF MICHIGAN

# COURT OF APPEALS

IBTIHAJ SHAMMOUT, a Minor, by her Next
Friend, HANI SHAMMOUT,

        Plaintiff-Appellant,

and

ARWA SHAMMOUT,

        Plaintiff,

v

KALAMAZOO JAYCEE,

        Defendant/Cross-Defendant/Cross-
        Plaintiff-Appellee,

and

DASTOLI & ASSOCIATES, INC. a/k/a UNITED
RENTAL,

        Defendant/Cross-Plaintiff-Appellee,

and

SHAWARMA KING, INC.,

        Defendant,

and

SHAWARMA KING FOUR, INC.,

        Defendant/Cross-Defendant-
        Appellee,

and

EVENTS, INC.,

UNPUBLISHED
March 29, 2016

No. 323532
Kalamazoo Circuit Court
LC No. 12-000251-NI

-1-

Defendant/Cross-Plaintiff/Cross-
Defendant-Appellee.

_____

Before:  BECKERING, P.J., and GLEICHER and M. J. KELLY, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

I concur with the majority's holding that defendant Kalamazoo Jaycee is entitled to summary disposition and that defendant Shawarma King Four, Inc. is not.  I respectfully disagree with the majority's resolution of plaintiffs' claims against Events, Inc. and Dastoli & Associates, Inc.  In my view, the evidence supports that Dastoli negligently breached a duty of care and that Events owed plaintiffs a duty of care.

## I. BACKGROUND FACTS

A powerful summer storm, packing high winds, swept through a Jaycee-sponsored festival in Kalamazoo.  Shawarma occupied a booth within the festival's food tent.  When the winds hit the tent, a billowing flap knocked over a table holding Shawarma's oil fryer and rotisserie machine.  Hot oil splashed on plaintiffs Arwa and Ibtihaj Shammout, severely burning both.  Arwa Shammout suffered an additional injury when the airborne rotisserie struck her back.  Plaintiffs filed this lawsuit against the four defendants alleging different negligence theories as to each.

The festival took place on the grounds of the Arcadia Creek Festival Place.  Jaycee hired Events, Inc. to administer the festivities.  These parties' written contract provided that Events would maintain all of the festival's accounts, manage the festival personnel, direct the entertainment, procure the "supplies and services," hire security, and make "[a]ny other decisions essential to the operation of the event."

Wayne Deering, Events' manager and "event coordinator," arranged for the tables used by the food vendors to be delivered, designated the location of each food booth, directed the placement of necessary electrical connections to the booths, and required each food vendor to pay Events a percentage of its take.  Deering rented the festival's tents from Dastoli.

More than an hour before the storm struck the festival, Deering spoke with meteorologist Vernon Keith Thompson.  Thompson advised Deering that an oncoming storm was "certain[]" to hit Kalamazoo, bringing with it "an intense burst of wind."  Deering visited the festival site and, in his words, "informed various folks that we could have some severe weather."  As the storm drew nearer, Deering advised the festival-goers to retreat into two tents securely anchored to the ground; the food tent was not one of them.  Deering claimed that he tried to evacuate the food tent, but "some people didn't leave that tent."  Food vendor Mike Chow heard the severe weather warning and turned off his cooking equipment.

Arwa Shammout and her young daughter, Ibtihaj, arrived at the food tent shortly before the storm struck, on a mission to deliver a dessert to Arwa's son Kameel, who worked for

Shawarma. The Shammouts remained in the food tent after the storm warning issued. Several minutes before the full force of the storm hit the food tent, Deering ordered someone to install a flap behind the table holding Shawarma's cooking equipment. Once installed, the canvas flap (also called a sidewall or curtain) simply hung from the upper portion of the tent; it was not secured to the ground in any manner. Kameel testified that when the wind hit the flap, the flap struck the table holding the cooking equipment, sending the fryer and its oil flying.

I agree with the majority's conclusion that Jaycee had no involvement in the events leading to plaintiffs' injuries, and bears no liability under any tort theory. My analysis differs from that of the majority regarding Dastoli and Events.

## II. THE LIABILITY OF DASTOLI

I respectfully submit that the majority has misunderstood plaintiffs' negligence claim against Dastoli. According to the majority, Dastoli "correctly installed the tent flap and . . . installing the tent flap was not contraindicated by the weather," and accordingly breached no duty. Plaintiffs' negligence claim against Dastoli flows from the *timing* rather than the method of the flap's installation. I agree that Dastoli correctly installed the tent flap, but respectfully take issue with the majority's conclusion that as a matter of law, hanging the flap qualified as a nonnegligent act. According to record testimony, Dastoli or one of his crew hung the tent flap behind Shawarma's booth only moments before the storm struck, despite Dastoli's admitted awareness that the tent flaps could act "like a sail." This conduct potentially qualifies as negligence.

I concede that the evidence concerning the timing of the tent flap installation conflicts. Dastoli claims that he hung the flap "a couple of hours maybe" before the storm hit the tent. But Awad testified that the flap was lowered within minutes before high winds propelled the flap against the table holding the cooking equipment, and Deering recalled that Dastoli was on the site "when the problem was happening."[1] Kameel recalled that someone named "Tory" installed the curtain, and that Tory advised that he worked for "the tent company."

Those familiar with tents and storms knew that in windy conditions, the tent flaps posed a very real danger. Michael Downey, the owner of the security company employed by Deering during the festival, testified as follows:

> *Q.* Were you receiving your directions from Wayne [Deering] as far as whether to evacuate or whether to tell the vendors to move the tables in?
>
> *A.* Correct.

---

[1] Dastoli and Deering explained that once installed, the flaps have only one position: down. Unlike window shades, they are not capable of being raised and lowered at will. Viewed in the light most favorable to plaintiffs, Awad's testimony supports that Dastoli or one of his employees installed the flaps (rather than "lower[ing]" them) just before the accident occurred rather than hours before.

*Q.* Did you have any input in this, or was he just strictly commanding you what to do?

*A.* He likes to open and tell me what I need to do.

*Q.* All right.

*A.* I took all directions from him, yes.

*Q.* . . . Was it his direction to tell people to move the table in, or was this something the two of you had kind of discussed?

*A.* The two of us.

*Q.* The two of you had input on that?

*A.* Yeah.

*Q.* And why was it said that, "We should tell people to move the - - to tell the vendors to move the tables toward the center"?

*A.* So the tables don't get knocked over by the sides.

The evidence supports an argument that before hanging the flap behind the Shawarma booth, Dastoli should have instructed Awad to move the table holding the cooking gear inward and away from the side of the tent, or to store the cooking gear on the ground (as vendor Chow had done). Given the weather conditions, the flap was a potentially dangerous addition to the tent precisely because it could strike the table, or objects on the table, and send things flying. Hanging it moments before the storm and in a dangerous location could constitute actionable negligence. I would reverse the trial court's grant of summary disposition to Dastoli on this basis.

## II. THE LIABILITY OF EVENTS

The majority affirms the trial court's grant of summary disposition to Events, holding "there was no evidence that . . . Events took any action that caused the hot-oil fryer to fall" and injure plaintiffs. Relying on this Court's opinion in *Dykema v Gus Macker Enterprises, Inc*, 196 Mich App 6; 492 NW2d 472 (1992), the majority further holds that Events had no duty to warn of "approaching severe weather." I respectfully disagree for two reasons. First, Events voluntarily undertook to monitor the weather conditions and to warn festival patrons of the approaching storm, thereby assuming a duty of care. In this sense, *Gus Macker* is wholly distinguishable. Second, Events ordered the installation of the flap behind the Shawarma booth. In undertaking these affirmative acts, Events subjected itself to legally cognizable duties of care.

Viewed in the light most favorable to plaintiffs, the record evidence substantiates that 60 to 90 minutes before the storm arrived, meteorologist Thompson advised Deering to expect that extremely high winds would hit the festival. In response to this warning, Deering ordered Downey to notify patrons and vendors of the approaching storm, thereby voluntarily shouldering

an obligation to warn festival participants that an incoming storm would bring particularly powerful winds. Deering further testified that when he learned of the storm's potential, he personally "went about the site, informed various folks that we could have some severe weather, and . . . took precautions such as putting objects down because maybe if we have wind, things that could harm somebody." Additionally Deering recounted that he "made the decision to tell that [sic] people go to the two permanently-anchored tents which did survive this perfectly, and evacuated the middle tent where the problem happened."

Thus, Deering recognized that the oncoming storm presented a danger to the festival patrons. Indeed, he foresaw the *specific* danger posed by the anticipated high winds—that tent flaps would billow inward, strike nearby objects, and create dangerous projectiles. Armed with this knowledge, Deering proactively attempted to protect festival-goers from the foreseeable hazards. He explained:

> I personally do recall telling one of the vendors who had a glass vase to please put that down below, no matter how much wind we have, this could be a problem and I didn't want it to shatter where there are people. But at the early stage of, I would say, maybe an hour before the storm came through, we were taking those precautions, talking to people about potential problems.

In my view, this testimony substantiates that Events assumed a duty of care.

In *Baker v Arbor Drugs, Inc*, 215 Mich App 198, 205; 544 NW2d 727 (1996), this Court drew on firmly established caselaw to observe that a defendant may face liability when it undertakes a duty that it otherwise does not bear:

> Courts have imposed a duty where a defendant voluntarily assumed a function that it was under no legal obligation to assume. *Sponkowski v Ingham Co Rd Comm*, 152 Mich App 123, 127; 393 NW2d 579 (1986); *Rhodes v United Jewish Charities of Detroit*, 184 Mich App 740, 743; 459 NW2d 44 (1990) [holding ltd in *Scott v Harper Recreation, Inc*, 444 Mich 441; 506 NW2d 857 (1993)]; *Terrell v LBJ Electronics*, 188 Mich App 717, 720; 470 NW2d 98 (1991); *Holland v Liedel*, 197 Mich App 60, 64-65; 494 NW2d 772 (1992); *Babula [v Robertson*, 212 Mich App 45, 50-51; 536 NW2d 834 (1995)].[2]

*Baker* involved the defendant pharmacy's use of a computer system to "monitor its customers' medication profiles for adverse drug interactions." *Id.* The defendant in *Baker* advertised that its computer system "was designed in part to detect harmful drug interactions." *Id.* Based on these facts, this Court concluded that the defendant pharmacy "voluntarily assumed a duty of care when it implemented" the computer system and advertised its function. *Id.* at 205-206.

---

[2] Like other seminal tort principles, perhaps this one was first clearly articlulated by then-Judge Cardozo: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v Shepard*, 233 NY 236, 239; 135 NE 275 (1922).

In *Schanz v New Hampshire Ins Co*, 165 Mich App 395, 401-402; 418 NW2d 478 (1988), this Court adopted and applied the following principles advanced in the Restatement Torts, 2d, § 323, p 135:

Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize is necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance on the undertaking.

The plaintiffs in *Schanz* owned a building insured by the defendant. *Id.* at 398-399. The defendant retained Commercial Services, Inc., another company, to inspect the building and to estimate its replacement cost. *Id.* at 399. Commercial Services prepared a report containing several serious errors. *Id.* The defendant reviewed the report but failed to detect the errors, and insured the building for an amount well under its actual replacement value. *Id.* at 399-400. After the building burned down, the plaintiffs sued the defendant for the difference, and the jury found in the plaintiffs' favor. *Id.* at 400.

On appeal, the defendant averred that it owed no duty to inspect and appraise the plaintiffs' building. *Id.* The plaintiffs countered that "once defendant undertook to appraise the building for purposes of informing plaintiffs of the required insurance coverage, defendant assumed a duty to use reasonable care in establishing the replacement cost value of the building." *Id.* This Court explained, "[t]he law does not impose a duty on insurers to inspect the premises of their insureds, although such an obligation may be undertaken." *Id.* at 401. This Court held that the trial court properly determined "that defendant owed a duty to plaintiffs to exercise reasonable care in determining the replacement cost coverage under the policy issued to plaintiffs" because material questions of fact existed with respect to whether the defendant undertook the duty described in § 323 of the Restatement. *Id.* at 401-402, 404-405. See also *Hart v Ludwig*, 347 Mich 559, 564; 79 NW2d 895 (1956) ("The law imposes an obligation upon everyone who attempts to do anything even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken, for nonperformance of which duty an action lies.") (quotation omitted).

I draw from this line of cases and the Restatement that Events faces liability in this case because it undertook a duty of care that it otherwise did not bear: to warn patrons of the storm. And Events undertook two additional affirmative actions that it was not obligated to perform: it ordered the installation of the tent flaps that it knew or should have known could smash into objects during a storm, and it instructed some (but not all) vendors to place movable objects out of harm's way. These affirmative acts render Events potentially liable for any failure to perform its voluntarily-assumed duties with reasonable care.

Citing *Gus Macker*, 196 Mich App 6, the majority opines that Events owed no duty "to warn a spectator of approaching severe weather," and I agree. But the facts of *Gus Macker* do

not correspond with the facts of this case, as in *Gus Macker* the defendants made no effort whatsoever to protect the basketball tournament participants from the storm. Events did. The majority concedes that "[i]f one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform that act in a nonnegligent manner," (quotation marks and citation omitted), but inexplicably fails to apply this noncontroversial legal precept, finding no evidence that Events "explicitly guaranteed the safety of Arwa or Ibtihaj with regard to inclement weather or the appliances used by vendors." Respectfully, this analysis simply does not apply to these facts, since the duties Events undertook had nothing to do with "guarantee[ing]" anyone's safety. Rather, Events voluntarily attempted to protect those present at the festival from the risks of the severe weather bearing down on the site. It did so through explicit weather warnings, instructions to stow possible projectiles and to vacate the food tent, and by hanging the flap. The latter act falls squarely within the reach of Restatement Torts, 2d, § 323(b), as it arguably increased the risk of harm "resulting from [a] failure to exercise reasonable care" in performing the undertaking.

In summary, having undertaken a responsibility to "batten down the hatches" and make the festival premises safe, Deering was obliged to exercise reasonable care. I believe that Events' voluntary rendering of services to the festival-goers gave rise to a tort duty that survives Events' summary disposition motion.

### III. SHAWARMA

I concur with the majority that the open and obvious danger doctrine does not bar plaintiffs' claim against Shawarma. In *Riddle v McLouth Steel Prods Corp*, 440 Mich 85, 96; 485 NW2d 676 (1992), our Supreme Court defined open and obvious hazards as dangers "known to the invitee" or "so obvious that the invitee might reasonably be expected to discover them." That plaintiffs qualify as licensees does not change the definition of an open and obvious danger. Here, the trier of fact could find that on casual inspection, an ordinary visitor to the food tent would not comprehend that during a wind storm, a flapping tent curtain could knock over the table holding the cooking gear. See *Novotney v Burger King Corp (On Remand)*, 198 Mich App 470, 474-475; 499 NW2d 379 (1993). Because the evidence creates a genuine issue of material fact in this regard, I concur with the majority's determination that summary disposition was improperly granted to Shawarma.

/s/ Elizabeth L. Gleicher